**Anastasia S. CHRISTOPHER,**
**Plaintiff–Appellee,**
**Cross–Appellant,**

v.

**STOUDER MEMORIAL HOSPITAL,**
**Defendant–Appellant,**
**Cross–Appellee.**

**Nos. 90–3400, 90–3429.**

United States Court of Appeals,
Sixth Circuit.

Argued March 28, 1991.

Decided June 24, 1991.

Rehearing Denied July 24, 1991.

Dennis A. Lieberman (argued), Richard Hemfling, Flanagan, Lieberman, Hoffman & Swaim, Dayton, Ohio, for plaintiff-appellee, cross-appellant.

William M. Dixon, Jr. (argued), Shipman, Utrecht & Dixon, Troy, Ohio, for defendant-appellant, cross-appellee.

Before JONES and SUHRHEINRICH, Circuit Judges, and FEIKENS, Senior District Judge.[*]

NATHANIEL R. JONES, Circuit Judge.

Defendant-appellant Stouder Memorial Hospital ("Stouder"), appeals the trial court's judgment for the plaintiff-appellee Anastasia Christopher in this Title VII civil rights action. Christopher cross-appeals the court's refusal to award her back pay on her retaliation claim.

### I.

Christopher, a female nurse, was awarded a B.S. degree in nursing from Ohio State University in 1974 and a M.S. degree in nursing from the same institution in 1977, with particular emphasis in maternal and child health. She is married to Charles Christopher, M.D., a practicing obstetrician and gynecologist.

From 1978 until 1983, Ms. Christopher was a faculty member at the Wright State University School of Nursing. In June 1983, she filed a sex discrimination claim against Wright State. Her claim eventually resulted in a Title VII lawsuit which was resolved prior to trial. No details about Christopher's charge or settlement are part of the record in this case.

During the lawsuit, Christopher's husband, Charles, was also experiencing difficulties with his hospital, where he was

---

[*] The Honorable John Feikens, Senior District Judge for the Eastern District of Michigan, sitting by designation.

head of obstetrics, and the couple decided to move to Troy, Ohio. Charles formed a partnership with Dr. Gerald Dysert, who was performing deliveries and gynecological surgery at Stouder when Dr. Christopher joined him in practice.

During the spring of 1985, Ms. Christopher was hospitalized for surgery at Stouder. During her recovery she discussed the possibility of nursing employment at Stouder with Sally Swisshelm, Director of Nursing. Christopher told Swisshelm that she had a real interest in getting back into nursing and that she had had discussions with her husband and his partner about working as a "scrub nurse" for them during surgery. Stouder hired Christopher on June 10, 1985. Her formal title was "pool nurse" although it appears she had been hired to work in some sort of capacity as a trainer for other nurses in the Ob/Gyn department.

After a brief period, Christopher's uncertain status resulted in tension with the other nurses. This was in part because she was attempting to train nurses many of whom had been at Stouder for many years. One of Christopher's duties during her work at Stouder was to prepare the obstetrical nurses to assist as scrub nurses during cesarean section procedures. Apparently, everyone agreed that Christopher herself needed training in this area, since she had very little prior experience as a scrub nurse. As a result, Christopher began to train in the Stouder operating room in July and August of 1985. The apparent plan was that Christopher would pass on her training to other nurses in obstetrics, rather than sending the nurses to another hospital for training.

In July, 1985, Christopher applied to Stouder to obtain limited privileges to act as a private duty scrub nurse at the hospital. The procedure for deciding on privileges was that the application would remain with the medical staff secretary until complete. The application would then be passed on to the Executive Committee of the Medical Staff, then to the full medical staff and finally to the Board of Trustees. During the period in which the application was being considered, the hospital's president was empowered to grant temporary privileges for a period of ninety days. The Executive Committee approved this request on August 6, 1985, and John Grubb, President of Stouder, granted Christopher temporary privileges on October 23, 1985.

After her temporary privileges were granted, Christopher began to act as a private scrub nurse for her husband and his partner. A scrub nurse's duties are primarily to prepare instruments for surgery, to hand them to the surgeon during the operation and to clean up after the operation. As of 1985, there were only two nurses acting in the capacity of private scrub nurse. According to Ms. Nagle, operating room supervisor, there had been only one prior experience with a private duty scrub nurse in her thirty years experience with surgery at Stouder. Normally, the procedure at Stouder was for regular nurses employed by the hospital to act as scrub nurses.

Private duty scrub nurses are normally paid by the doctors with whom they work. They are not employees of the hospital itself, and the hospital does not cover their insurance or benefits. However, during her training period, and during the tenure of her temporary privileges status, Christopher was paid and insured by the hospital.[1]

In January, 1986, Ms. Swisshelm concluded that the obstetrical nurses were not obtaining their new skills fast enough and hired a special obstetrics supervisor to perform the training tasks Christopher was hired to perform. Grubb approved this new plan, and on January 10, 1986, Christopher was informed that her services as a clinical nurse specialist would no longer be needed. It is not clear from the record whether Christopher was actually fired at this point, or whether she remained on the schedule as a "pool nurse."

---

1. Christopher's pay arrangement seems to have been a temporary one indulged in by the hospital because Christopher's husband and his part- ner were trying to save for some new laser equipment. The details of this pay arrangement are not crucial for the resolution of this appeal.

Christopher objected to Stouder's decision and hired counsel to represent her against the hospital.[2] In the meantime, her temporary privileges had expired. Apparently, one of her references had not responded to the hospital's request for a reference letter because he had moved his practice. He was later contacted and Christopher's file was completed on January 26, 1986.

Before Christopher's application for limited privileges was reviewed by the Executive Committee, Ms. Swisshelm was asked to review Christopher's competence. In a memo dated January 31, 1986, she questioned Christopher's training ability and characterized her as "disruptive" and "untrustworthy." She noted that Christopher had written on doctor's progress notes in contravention of hospital policy even after being advised it was inappropriate. She also asserted that Christopher had caused "chaos" in both obstetrics and surgery.

Dr. Mark Hess, a member of the Executive Committee, also prepared a memorandum on Christopher. At the request of the Chief of Medical Staff, Dr. Ellenbogen, he contacted L.R. Jordan, chief executive of Miami Valley Hospital, about Christopher's work when she was stationed there by Wright State. According to Dr. Hess's memo, Jordan said that Christopher's tenure at Miami Valley had been "marked by severe turmoil," that she had "assumed authority far beyond what was proper," including writing prescriptions for her husband's countersignature, and that she had an "endless series of conflicts with many people." He also advised that Miami Valley insisted on her transfer and she thereupon sued for sex discrimination.

On February 4, 1986, the Executive Committee voted unanimously to deny Christopher's application for limited privileges. On March 20, 1986, Christopher "withdrew" her prior application for limited privileges and filed a second more limited application. It appears she filed the second application because she was informed that

her first application had been too broad. It seems Christopher had asked for permission to do a number of procedures normally handled exclusively by doctors at Stouder. Christopher's second application was supported by recommendation letters from her husband, Dr. Dysert and Dr. Kevin Horvath, a pediatrician practicing at Stouder.

After consulting with Dr. Ellenbogen, Chief of Staff, Ms. Nagle prepared a set of standards for private scrub nurses for the hospital. These standards included a requirement that private scrub nurses have at least one year of experience as a scrub nurse. Evidently, these standards were prepared in February, 1986, but were not approved by the hospital until 1987. Nonetheless, the standards were used to prepare a questionnaire for the other surgery nurses to review Christopher's qualifications. Virtually, all of the nurses surveyed found that Christopher was deficient with respect to the standards. These results were made available to the Executive Committee which on May 6, 1986, again voted to deny Christopher limited privileges.

This action followed and the parties agreed to conduct the trial before a magistrate. A trial was held from July 11–13, 1988.

Dr. Hess was the only member of the Executive Committee to testify at trial. During his testimony he denied that he had considered Christopher's prior Title VII lawsuit for sex discrimination at Miami Valley in deciding how to vote on Christopher's privileges application. However, the magistrate credited testimony by Christopher as to two conversations she had had with Grubb and with Dr. Hess. Christopher testified that she had talked to Grubb by telephone in January of 1986 and attempted to negotiate the issue of her privileges. He reportedly responded, "If you hadn't had some legal action prior to this, this might not have occurred." J.App. at 23. Christopher also recalled a conversation with Dr. Hess on March 9, 1986, in which he reportedly also told her that she

---

**2.** Christopher's complaint included a Title VII claim with regard to her "dismissal" from her trainer position, as well as a state claim for breach of contract. However, those claims were both dismissed and that decision has not been appealed.

was having difficulties because of her prior legal action at Miami Hospital.

While the court dismissed all of Christopher's other claims at the close of plaintiff's case, he found that she had established her claim of retaliation. In reaching this result the court found that Christopher's prior sex discrimination action had been mentioned enough times in the process surrounding her applications for limited privileges to warrant a conclusion that Strouder would not have made the same decision absent the factor of the prior suit. The court also noted that much of the evidence used to deny Christopher's second application "seems to have been manufactured to guarantee the result." J.App. at 31. Specifically, the court found that the scrub nurse standards drafted by Ms. Nagle required one year experience as a scrub nurse, which made Christopher ineligible. The court found these standards "plainly discriminatory against the private scrub nurse concept since Mrs. Nagle admitted on the stand that nurses were sometimes hired directly from nursing school into the operating room at Stouder." *Id.* Finally, the court concluded that Ms. Nagle could have easily learned that Christopher would be excluded by the one-year requirement by looking at her file.

Despite the court's finding in favor of Christopher on her retaliation claim, it found that Christopher was not entitled to back pay. While there was some initial confusion about whether the court had the authority to award back pay damages against Stouder when the hospital was not Christopher's employer, the court ultimately determined that back pay was not appropriate because Christopher had failed to prove damages.

Recognizing that the hospital had a strong interest in ensuring that Christopher was qualified to be a private scrub nurse, and at the same time, acknowledging that the process used to evaluate Christopher had been flawed, the court ordered the parties to negotiate a neutral means for evaluating Christopher's abilities as a scrub nurse. When the parties failed to reach a reasonable solution, the court ordered that Christopher work for six weeks for two neutral doctors, who would independently evaluate her performance. When this too became unworkable, due in part to Stouder's refusal to cooperate, the court ordered that Christopher be granted limited privileges to work as a private scrub nurse at Stouder for any doctor who would employ her. The court was careful to make clear that it was not forcing Christopher into an employment relationship with the hospital. Rather, it was simply undoing the discriminatory application of heightened standards which had been applied to Christopher.

## II.

Stouder first contends that the court lacked jurisdiction to hear this case because Christopher was neither an "employee" nor an "applicant for employment" at Stouder. The provision of the Civil Rights Act which enables plaintiffs to sue for retaliation provides, in pertinent part:

(a) It shall be an unlawful employment practice for an employer *to discriminate against any of his employees or applicants for employment* ... because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3 (emphasis added). While it is true that Christopher was not a direct employee of Stouder, we find that Stouder's control over Christopher's ability to practice as a private scrub nurse sufficiently impacted her employment opportunities to bring her claims within the intended scope of § 2000e–3.

As the trial court noted, our caselaw requires that "[t]he term 'employee' in Title VII 'must be read in light of the mischief to be corrected and the end to be attained.'" J.App. at 70 (Order denying motion for new trial, quoting *Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir. 1983)). Further, we have repeatedly said that "Title VII of the Civil Rights Act should not be construed narrowly." *Tipler*

*v. E.I. du Pont de Nemours and Co.*, 443 F.2d 125, 131 (6th Cir.1971). In this spirit, several courts have held that Title VII does not require a formal employment relationship between the plaintiff and the defendant. Rather, a plaintiff is protected if the defendant is one "who significantly affects access of any individual to employment opportunities." *Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 422–25 (7th Cir.1986) (doctor stated a claim under Title VII when hospital denied staff privileges even though doctor was not an employee of the hospital); *Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019, 1021 (9th Cir.1983) (finding a cause of action under Title VII when " 'a defendant subject to Title VII interferes with an individual's employment opportunities with another employer.' ") (quoting *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 n. 3 (9th Cir.1980)).

The trial court in this case relied on the D.C. Circuit's decision in *Sibley Mem. Hosp. v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973) to find that it had jurisdiction over Christopher's suit. *Sibley Mem. Hosp.* concerned a sex discrimination claim under Title VII by a private duty nurse against a hospital. The basis of the plaintiff's claim was that the hospital's Nursing Office would not refer the nurse, who was a male, to female patients who requested a private duty nurse. This action by the hospital was in contravention of its own policy of referring patients to the next available private nurse in its register. The defendant hospital moved to dismiss on the ground that the plaintiff was not in an employer-employee relationship with the hospital and therefore the court did not have jurisdiction to hear the claim. However, the district court found that the plaintiff stated a claim under Title VII and the D.C. Circuit affirmed.

In its *Sibley Mem. Hosp.* opinion, the court began by pointing out that "The Supreme Court has said that the Congressional objective in Title VII is 'plain from the language of the statute,' and that it is 'to achieve *equality of employment opportunities*[.]' " *Id.* at 1340–41 (emphasis original) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1969)). The court then rea-soned that in certain circumstances control over access to employment may reside in organizations outside the regular employer-employee relationship. *Id.* at 1341. The court found it significant that Title VII explicitly applies to organizations such as unions or employment agencies "which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties." *Id.* at 1342; *see* 42 U.S.C. § 2000e–2(b) and (c). From these premises, the court reasoned:

> To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

*Id.* at 1341. The court went on to determine that the hospital, while not the plaintiff's employer, was in the same position to interfere with the plaintiff's employment opportunities as unions or employment agencies, and therefore, "neither the spirit nor, more essentially, the language of the Act" prohibited the plaintiff from proceeding against the defendant hospital. *Id.* at 1342.

The facts of the instant case are directly analogous to the situation in *Sibley Mem. Hosp.* Like the nurse in *Sibley*, Christopher cannot pursue her employment opportunity of working as a private scrub nurse if Stouder does not grant her limited privileges. If Stouder denies those privileges to Christopher on impermissible grounds, it is, in effect, denying her employment on impermissible grounds, despite the fact that it does not pay her salary.

■ Stouder argues that *Sibley, Gomez,* and *Doe* are distinguishable because all of those cases were actions brought under § 2000e–2, which allows a broader range of persons to sue than § 2000e–3 upon which Christopher relies. § 2000e–2 provides in relevant part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire ... *any individual,* or otherwise discriminate against *any individual* with respect to his compensation, terms, condition, or privileges of employment[.]

42 U.S.C. § 2000e–2 (emphasis added). By comparison, § 2000e–3 refers to the protected class as "employees or applicants for employment." *See* 42 U.S.C. § 2000e–3 (quoted *supra.*). Stouder argues that the difference in the language of the two provisions indicates a Congressional intent to provide less coverage for retaliation than for other forms of discrimination under the Act.

While Stouder's position has some logical appeal at first glance, we find it is ultimately not persuasive. First, while the courts in *Doe, Gomez,* and *Sibley Mem. Hosp.* do rely, to some extent, on the "any individual" language of § 2000e–2, this language is not the sole basis of these holdings. For example, in *Sibley Mem. Hosp.,* the court makes much of the fact that the general remedial section of Title VII does not refer only to any "employee" but provides recourse to "persons aggrieved." *See* 42 U.S.C. § 2000e–5(b); 488 F.2d at 1341–42; *see also Gomez,* 698 F.2d at 1021. The court states: "The fact that the Act purports to provide remedies for a class broader than direct employees is a strong indication that the proscriptions contemplated by [§ 2000e–2] reach beyond the immediate employment relationship." *Sibley Mem. Hosp.,* 488 F.2d at 1341. It is important to note that the remedial section to which the court refers, § 2000e–5, applies equally to plaintiffs suing under § 2000e–2 and § 2000e–3. Thus, the courts in reaching their conclusions in *Sibley* and *Gomez,* were not relying on the "any individual" language of § 2000e–2, but rather, were discerning the meaning of "employee" in the Title VII context by looking to the intent and scope of Title VII as a whole.

In addition, as discussed above, *Sibley Mem. Hosp.* extensively discusses the fact that § 2000e–2 applies to unions and employment agencies whose actions might interfere with a person's access to employment opportunity with other employers though these organizations might not be serving as an employer. Significantly, § 2000e–3 also explicitly applies to unions and employment agencies. Thus, if the analogy between the hospital's interference with Christopher's employment as a private scrub nurse in the instant case, and the interference by a union or employment agency in the employment opportunities of its members or clients holds, then a plaintiff alleging interference by a defendant in the plaintiff's employment with third parties ipso facto states a claim under either § 2000e–2 or § 2000e–3. *See Doe,* 788 F.2d at 423 ("Congress presumably did not intend to allow the hospital to exploit its power to grant or deny staff privileges in order to discriminatorily interfere with [plaintiff's] employment opportunities."); *see also Pao v. Holy Redeemer Hosp.,* 547 F.Supp. 484, 494–95 (E.D.Penn.1982) (following *Sibley Mem. Hosp.* to find that hospital's denial of staff privileges to a doctor was sufficient to state a claim under Title VII).

In the instant case, there was ample evidence presented at trial to demonstrate that Stouder was an organization which was capable of and in fact did affect Christopher's ability to engage in her employment as a scrub nurse. As the trial court put it,

By discriminating against Plaintiff and refusing to grant her privileges to work in its facility, Defendant realistically prevents Plaintiff from performing the job for which she was hired by the physicians. This clearly interferes with Plaintiff's employment relationship with the hiring physicians and with her opportunity to perform her work.

J.App. at 73 (Order denying motion for new trial). As the goal of Title VII is to preserve employment opportunity, we can see no reason to conclude that Congress intended Title VII to prohibit discrimination by a non-employer defendant on the basis of race or sex, and to allow the same non-employer defendant to discriminate against a person who engages in protected activity under Title VII. In both instances the acts

of the non-employer defendant have the effect of denying the plaintiff employment based upon impermissible grounds under the Act. Thus, we find that the trial court had jurisdiction to hear Christopher's § 2000e–3 claim based upon the principles and reasoning articulated in *Sibley Mem. Hosp.* and its progeny.

■ Stouder also asserts that the trial court did not have jurisdiction to hear this case because Title VII does not apply to "independent contractors." In this argument, Stouder asserts that Christopher's relation to the hospital is analogous to that of an independent contractor. *See Falls v. Sporting News Pub. Co.*, 834 F.2d 611, 613 (6th Cir.1987) (while the term "employee" is to be construed broadly in Title VII, it is not meant to reach independent contractors). In the instant case, the trial court specifically found that "Plaintiff would not be a hospital employee nor would she be an independent contractor with respect to the hospital." J.App. at 73. The court's finding is supported by the record. As a private scrub nurse, Christopher would not be paid by the hospital nor would she receive benefits or insurance from the hospital. Her direct employment relationship would be with the doctor who hired her to assist in surgery for each specific operation. While Stouder would provide Christopher with equipment and facilities to perform her work, Stouder would not have any control over her work, except to the extent that it could impose its uniform safety standards as it does on all persons who have staff privileges in the hospital. Finally, at no time would Christopher be required to perform services for the hospital itself. On these facts, no contractual relationship would exist between Stouder and Christopher either as an employee or as an independent contractor.[3] For these reasons, we find that Christopher does not fall within the independent contractor exception to Title VII.

In sum, we find that the trial court properly had jurisdiction over Christopher's claims.

### III.

Stouder next argues that the trial court did not apply the correct legal standards in concluding that Christopher had made out a case of retaliation under Title VII. Specifically, Stouder contends that the trial court failed to find that Christopher was "otherwise qualified" for the position she was allegedly denied based upon retaliation, and that Christopher failed to show that the Stouder hired a less qualified scrub nurse after her application was denied.

■ As the trial court correctly noted, the elements of a prima facie case of retaliation are as follows:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his [or her] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the·adverse employment action.

*Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987). Based upon this framework, the trial court found that Christopher had met her prima facie burden. Stouder argues that the trial court erred in applying this framework alone, without making the other findings required for a prima facie case of discrimination under Title VII under *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972). *Wrenn* made clear that "[p]roof of a retaliation claim under Title VII is governed by *McDonnell Douglas*[.]" *Wrenn*, 808 F.2d at 500. Key to a finding

---

3. The fact that Christopher is neither Strouder's direct employee nor of an independent contractor does not undermine the fact that Stouder has exclusive control over Christopher's ability to practice as a private scrub nurse. As described above, even though Christopher does not provide any services for the hospital, her ability to function as a private scrub nurse is contingent upon Strouder's grant of limited privileges. Thus, while Christopher's relationship with Strouder is not contractual, she nevertheless states a claim under Title VII based upon her allegations that Strouder's acts of retaliation prevented her from entering into employment contracts with private doctors.

of discrimination under the *McDonnell Douglas* framework is proof that the plaintiff "applied and was qualified for a job for which the employer was seeking applicants," and "that, despite his qualifications, he was rejected". 411 U.S. at 802, 93 S.Ct. at 1824. Stouder argues that Christopher's retaliation claim is fatally flawed because she failed to meet her burden of demonstrating that she was qualified to receive limited privileges as a private scrub nurse. In addition, Stouder asserts that the trial court, in finding that Christopher had made out her claim of retaliation, never made an explicit finding that Christopher was qualified for the position.

After weighing the testimony and evidence before it, the trial court concluded that "Mrs. Christopher has persuaded this Court that she would have received limited privileges but for retaliation against her on the basis of her prior claim against Wright State." J.App. at 30–31. Christopher argues that the trial court's finding that she would have received limited privileges but for Stouder's retaliation is an implicit finding that she was qualified to perform the job of a scrub nurse. However, as Stouder points out, the court seemed to have serious doubts about Christopher's qualifications. For example, at the end of its memorandum opinion the court stated

> Ms. Christopher seeks reinstatement of her limited privileges and to that she is entitled. Stouder is, however, entitled to ensure that she is *technically competent as a scrub nurse, since there were some valid concerns expressed about that at the time she was at the hospital* and it has now been two and one-half years since she has acted in that capacity. Accordingly, counsel for the parties are directed to consult with a view to devising a neutral objective measurement of Ms. Christopher's present competence to act as a scrub nurse.

J.App. at 33–34 (emphasis added). In addition, the court prescribed a six-week trial procedure to determine Christopher's qualifications for the scrub nurse position. This procedure required medical evaluators to observe Christopher and file reports. As to the reports, the court stated that, "[e]ach such report shall include the doctor's opinion as to whether Mrs. Christopher is qualified for employment as a gynecological and obstetrical private duty scrub nurse." *Id.* at 46.

Christopher argues that the court was primarily concerned with her present qualifications as it had been several years since she acted as a nurse due to this litigation. However, the court specifically noted that there had been some valid concerns about her qualifications at the time she was at the hospital. *Id.* at 33–34. Further there is little or no evidence in the record that demonstrates Christopher's qualifications to act as a private scrub nurse, and this evidence came from her husband and her husband's partner. As Stouder correctly points out, "Congress did not intend by Title VII ... to guarantee a job to every person regardless of qualifications." *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Further, "qualification of the complainant is the pivotal component of the *McDonnell Douglas* prima facie case." *Williams v. Boorstin*, 663 F.2d 109, 118 (D.C.Cir.1980) (emphasis omitted), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981). Thus, we hold that it was error for the trial court not to make an explicit finding that Christopher was qualified to act as a scrub nurse before concluding that she was the victim of discrimination. We therefore remand for the district court to determine whether Christopher was qualified to act as a private duty scrub nurse at the time the alleged discrimination took place.

In addition to its assertions regarding the trial court's failure to find that Christopher was qualified, Stouder asserts that the district court erred in failing to require Christopher to show that other less qualified applicants were granted privileges at Stouder after she was denied such privileges. As Stouder correctly points out, the Supreme Court in *McDonnell Douglas* suggested that plaintiffs seeking to create an inference of discriminatory failure to hire must show, in addition to membership in a protected class and quali-

fications, that the defendant continued to accept applicants for the position from equally qualified persons. 411 U.S. at 802, 93 S.Ct. at 1824. However, Stouder's premise that failure to make such a finding is reversible error is based upon a misapprehension of the law.

It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* formula. *Blalock v. Metal Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985). As the court explained,

> Direct evidence and the *McDonnell Douglas* formula are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent. "Where the evidence for a prima facie case consists ... of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference of discrimination is required."

*Id.* (citations omitted). In the instant case, the trial court found that Stouder raised its prior qualification standards and denied Christopher limited privileges in retaliation for her prior sex discrimination suit. The court based its finding upon Christopher's own testimony of discussions she had had with Dr. Hess and Grubb, and the fact that reference to Christopher's prior suit appeared in Dr. Hess's memo to the Executive Committee. Thus, there was direct evidence upon which the court could find that Stouder acted in a discriminatory manner with regard to Christopher. In other words, there was no need for Christopher to produce evidence of retaliatory motive under the *McDonnell Douglas* framework because the court did not have to infer from Stouder's actions with other applicants that the hospital discriminated in this case.

■ Stouder also argues that since Christopher's privileges were denied, the hospital has not granted privileges to any private scrub nurse who did not have at least one year of experience. Thus, Stouder argues, it has not discriminated against Christopher. Rather, the hospital has simply applied its neutral qualification standards across the board to all applicants. However, even if we accept Stouder's claims that it has consistently applied the one year experience standard to applicants after Christopher, this still does not refute the evidence that the hospital raised its prior standards in Christopher's case in order to deny her privileges for impermissible reasons of retaliation. Therefore we find that the trial court's determination that Stouder acted with a retaliatory motive is not clearly erroneous.

### IV.

Stouder's last contention is that the trial court mistakenly found that Stouder's new standards for the hiring of private scrub nurses, written by Ms. Nagle, were retaliatory because Ms. Nagle testified that she did not know that Christopher had filed a prior discrimination action. As Christopher points out, this alleged error is based upon a misapprehension of what the trial court found. In fact, the court did not determine that the writing of the standards was retaliatory, although it hinted that they may have been written to include a one year experience requirement which would exclude Christopher. Rather, the discriminatory act was the application of these new higher standards to Christopher by the Executive Committee and other decisionmakers. It was this application of the standards which "differed substantially from the bases upon which Stouder had in the past hired scrub nurses into its own employment", which evidenced Stouder's discriminatory purpose. J.App. at 75. Therefore we find that the court's finding that the standards used to deny Christopher's application were employed for a retaliatory purpose was not clearly erroneous.

### V.

■ On cross-appeal, Christopher challenges the trial court's failure to grant her back pay damages on her retaliation claim. As Christopher points out, this court has held that:

The finding of discrimination by the district court, in addition to the nature of the relief (compensatory as opposed to punitive), and the clear intent of Congress that the grant of authority under Title VII should be broadly read and applied mandate an award of back pay unless exceptional circumstances are present.

*Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 876 (6th Cir.1973). Moreover, this court has held that mere difficulty in calculating the amount of the pay award does not constitute "exceptional circumstances" such as would justify the denial of back pay. *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). However, an "[a]ward of back pay is not an automatic or mandatory remedy but is within the discretion of the [Trial] Court." *Kennerly v. ARO, Inc.*, 447 F.Supp. 1090, 1101 (E.D. Tenn.1987) (citing *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Christopher argues that the trial court had no recognizable justification for denying back pay.

■ The trial court addressed the issue of back pay twice in its various post trial orders. In its original memorandum opinion, the court found that Christopher was not entitled to back pay for two alternative reasons. First, the court asserted that it was not entitled to grant compensatory damages under Title VII and that since Stouder was not Christopher's employer and would not have paid her salary, it could not be charged with back pay damages. Second, the court noted that "the proof of loss with respect to that potential employer was quite sketchy." J.App. at 33.

Subsequently, the court amended its prior findings of fact and conclusions of law on the back pay issue. In its amended findings, it first noted that it was in error as to its inability to grant a back pay award against Stouder. However, the court explained and affirmed its findings as to the inconclusive nature of the proof on back pay. The court stated:

[T]he testimony was very vague about what the arrangement [between Christopher and her husband and his partner] was going to be. The Court's notes reflect no testimony from Ms. Christopher about a pay arrangement. Dr. Dysert testified that [the partnership was] still trying to save for a laser [for surgery] and probably would have started Ms. Christopher out at $1.00. Dr. Christopher admitted there was no agreement about what to do, but thought her salary probably would be $12,000 per year when she went on the doctor's payroll.

\* \* \* \* \* \*

The extreme ambiguity of the intended arrangement as outlined above shows Plaintiff did not prove what she actually would have received. Nor was there any proof of what other private duty nurses are paid so as to permit finding an average. Plaintiff did not even suggest in her Proposed Findings of Fact and Conclusions of Law an amount of lost wages from the intended arrangement. While back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case, neither can such an award be appropriately founded on mere speculation.

J.App. at 37–38. Based upon these findings, we find that the court did not abuse its discretion in denying back pay in this case. Therefore, we affirm the denial of back pay.

### VI.

For the foregoing reasons, we REMAND for the trial court to make specific findings as to Christopher's qualifications to perform as a private scrub nurse at the time she was denied privileges. We AFFIRM the findings of the trial court in all other respects.