**Angelina DIANA, Plaintiff,**

v.

**Joseph SCHLOSSER, Greater Hartford Communication Corp., and Traffic Net of Connecticut, Inc., Defendants.**

**No. 3:95 CV 646(CFD).**

United States District Court,
D. Connecticut.

Sept. 14, 1998.

Mark Stevens Winslow, Mark D. Soycher, Rebecca M. Vincente, Soycher & Winslow, Bloomfield, CT, for Plaintiff.

Donald R. Holtman, Steven L. Seligman, Cynthia M. Barlow, Katz & Seligman, Hartford, CT, Aaron L. Gersten, Philip K. Meister, Gersten & Gersten, Hartford, CT, for Defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

The plaintiff, Angelina Diana, brought this action against the defendants, Joseph Schlosser, Greater Hartford Communication Corp., d/b/a WCCC ("WCCC"), and Traffic Net of Connecticut, Inc. ("Traffic Net"), seeking damages and equitable relief for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), violations of the Connecticut Fair Employment Practices Act, Conn.Gen.Stat. § 46a–51 *et seq.*, tortious interference with a contract, defamation, and intentional infliction of emotional distress.

Pursuant to Federal Rule of Civil Procedure 56, WCCC moved for summary judgment on the plaintiff's claims brought under Title VII, asserting that it is not the plaintiff's employer and does not control the terms and conditions of the plaintiff's employment. For the reasons set forth below, WCCC's motion for summary judgment is DENIED.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be granted if the pleadings, depositions, affidavits, answers to interrogatories, admissions and other evidence show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *AXA Marine and Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc.,* 84 F.3d 622, 624 (2d Cir.1996). "While genuineness runs

to whether disputed factual issues can 'reasonably be resolved in favor of either party,' materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial." *Graham*, 89 F.3d at 79. "The Supreme Court teaches that a 'genuine' dispute over a material fact arises only where it can be said that the evidence would allow a reasonable jury to find in favor of the non-moving party." *Repp v. Webber*, 132 F.3d 882, 889–90 (2d Cir.1997) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

When deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *American Tel. and Tel. Co. v. City of New York*, 83 F.3d 549, 551 (2d Cir.1996). "[T]he duty of a court on a motion for summary judgment is to determine whether there are any genuine issues of material fact to be resolved by trial and not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution." *Repp*, 132 F.3d. at 890 (2d Cir.1997).

## II. FACTS[1]

The plaintiff, Angelina Diana, began working for Traffic Net on October 25, 1993, as an on-air traffic reporter. Diana was a salaried employee of Traffic Net. Traffic Net was in the business of providing on-air traffic reports for radio stations in exchange for advertising time on those stations. Diana's duties at Traffic Net required her to compile information regarding traffic conditions during the morning and afternoon rush hours, and to provide live or taped reports to various radio stations. The live reports were given over the telephone and broadcast by the radio stations. One of the radio stations for which Traffic Net provided live, on-air traffic reports was WCCC. In exchange for providing WCCC with the traffic reports, Traffic Net was given commercial air time on WCCC during the traffic reports and an additional six minutes of commercial air time per week to be used at Traffic Net's discretion.

In March, 1994, Diana was assigned to provide the on-air traffic reports for the Sebastian Show, a highly-rated, live, morning radio program on WCCC hosted by the defendant Joseph Schlosser, an employee of WCCC.[2] Schlosser used the name "Sebastian" on the show. WCCC approved all Traffic Net reporters who appeared on its radio programs. Diana's assignment to the Sebastian Show was in addition to the other radio programs for which she provided traffic reports, but she viewed the assignment to the Sebastian Show as an important career opportunity which would have given her a great deal of exposure in the Greater Hartford area.

Diana's first traffic report for the Sebastian Show was scheduled for live broadcast on the morning of March 9, 1994. Moments before her first broadcast on the Sebastian Show, Schlosser introduced Diana on the air as "Big Boobs" and demanded that she refer to herself by that name during the traffic reports. Diana refused to use that name on the air. Diana provided three traffic reports for the Sebastian Show on the morning of March 9, 1994, and each time Schlosser referred to her as "Big Boobs." After the third traffic report, Schlosser refused to allow Diana to give any further traffic reports

---

1. The recited facts are taken from the parties' Local Rule 9 statements of disputed and undisputed material facts; the affidavits of Diana, Saul Dresner (the President of Greater Hartford Communications Corporation), and Victor Kovich (the plaintiff's supervisor at Traffic Net); the deposition testimony of Diana, Schlosser, Kovich and Ron Dresner (the Operations Manager at WCCC); WCCC's responses to plaintiff's first set of interrogatories; the contract between Diana and Traffic Net, dated October 25, 1993; and the contract between Traffic Net and WCCC, dated November 10, 1986.

2. In its motion for summary judgment, WCCC does not challenge whether it is liable for the acts of the defendant Schlosser.

on the Sebastian Show because she would not refer to herself by his chosen on-air nickname. After each traffic report, Diana complained about Schlosser's conduct to either Traffic Net or WCCC.

On March 10 and 11, 1994, Schlosser again refused to allow Diana to give traffic reports during the Sebastian Show because she would not refer to herself by the nickname. The following week, Schlosser was away on vacation and Diana gave the traffic reports during the morning radio broadcast on WCCC without incident. Schlosser returned from vacation on March 21, 1994, and still would not allow Diana to give the traffic reports on the Sebastian Show unless she referred to herself by the nickname. WCCC did not order Schlosser to stop this conduct. Diana was then reassigned by Traffic Net and another Traffic Net employee gave the traffic reports on the Sebastian Show. As a result of her reassignment, Diana's on-air time was reduced significantly.

After March 21, 1994, Diana continued to work the same number of hours and receive the same pay from Traffic Net. Traffic Net did not discipline Diana for her refusal to use the nickname Schlosser had chosen for her. Diana, however, was not given a replacement on-air assignment following her removal from the Sebastian Show and, instead, she was assigned by Traffic Net to perform clerical duties in the time she otherwise would have been on the air for the Sebastian Show. Diana left Traffic Net on April 11, 1994.

## III. DISCUSSION

In her substitute amended complaint the plaintiff has alleged three causes of action against WCCC under Title VII. The first count alleges sexual harassment by way of a hostile work environment, the second count alleges quid pro quo sexual harassment and the third count alleges retaliation. The issue raised by WCCC's motion for summary judgment is whether the plaintiff can seek relief under Title VII from WCCC.[3] Specifically, WCCC asserts that it was not the plaintiff's employer and that it did not control the

terms and conditions of the plaintiff's employment for purposes of liability under Title VII. The plaintiff concedes that she was not an employee of WCCC. The plaintiff does argue, however, that WCCC controlled the terms and conditions of her employment to such a degree that she can maintain a Title VII claim against WCCC.

Under Title VII, an "employer" is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person. . . ." 42 U.S.C. § 2000e(b). An "employee" is defined as "an individual employed by an employer." 42 U.S.C. § 2000e(f). In its motion, WCCC concedes that it is an "employer" as defined by Title VII, but argues that it did not have the necessary employment relationship with the plaintiff to permit liability under Title VII.

### A. Employment Relationship

■ A line of decisions beginning with *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973), recognized that, even in the absence of a direct employment relationship between a plaintiff and defendant, a defendant is liable under Title VII for its discriminatory acts toward a plaintiff if the defendant interferes with the plaintiff's employment opportunities with a third party and the defendant controls access to those opportunities. *See, e.g., Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527, 1532 (11th Cir.1990) ; *Zaklama v. Mt. Sinai Med. Ctr.,* 842 F.2d 291, 294 (11th Cir.1988); *Doe on Behalf of Doe v. St. Joseph's Hosp.,* 788 F.2d 411, 422–23 (7th Cir.1986); *Gomez v. Alexian Bros. Hosp.,* 698 F.2d 1019, 1021 (9th Cir. 1983); *Shehadeh v. Chesapeake and Potomac Tel. Co.,* 595 F.2d 711, 721 (D.C.Cir.1978);

---

**3.** WCCC's motion for summary judgment does not challenge whether Diana can offer enough

evidence to prove each of her Title VII claims.

Moland v. Bil–Mar Foods, 994 F.Supp. 1061, 1073 (N.D.Iowa 1998); Pelech v. Klaff–Joss, L.P., 815 F.Supp. 260, 263 (N.D.Ill.1993); King v. Chrysler Corp., 812 F.Supp. 151, 153 (E.D.Mo.1993); Vakharia v. Swedish Covenant Hosp., 765 F.Supp. 461 (N.D.Ill.1991). The Second Circuit has also adopted the reasoning of Sibley. See Spirt v. Teachers Ins. & Annuity Ass'n, 691 F.2d 1054, 1063 (2d. Cir.1982) (Under Title VII, the term "employer" is "sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether the party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." (citing to Sibley and other cases from the Sibley line of authorities)), vacated and remanded on other grounds, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983); see also Kern v. City of Rochester, 93 F.3d 38, 45 (2d Cir.1996) (citing Spirt with approval but distinguishing the decision on other grounds); Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir.1995) (citing Sibley and Spirt and noting that the Sibley rationale has been applied by other circuits in the independent contractor context).

This line of cases is based upon the reasoning that:

> Control over access to the job market may reside, depending on the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to [her]. To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.

Sibley, 488 F.2d. at 1341.

In Sibley, the plaintiff was a male, private-duty nurse who was assigned to patients through a registry and referral system for private-duty nurses in the District of Columbia. The plaintiff was paid directly by his assigned patients and was not employed by the defendant hospital. On two occasions, however, supervisors at the hospital refused to allow the plaintiff to report to female hospital patients to whom he was assigned. The District of Columbia Circuit Court of Appeals held that the plaintiff was permitted to pursue a Title VII claim against the hospital because the hospital, although not plaintiff's employer, controlled the plaintiff's access to his assigned patients.

In Zaklama v. Mt. Sinai Medical Center, supra, the plaintiff was a physician in a residency program at Jackson Memorial Hospital who was assigned to work at Mt. Sinai Medical Center for a three-month rotation. Mt. Sinai gave the plaintiff poor evaluations and ultimately told him to leave Mt. Sinai before the end of his rotation. Subsequently, the plaintiff was removed from the residency program by his employer, Jackson Memorial Hospital. The plaintiff then filed an action against Mt. Sinai and Jackson Memorial under Title VII and 42 U.S.C. § 1981 claiming that his poor evaluations and his removal from Mt. Sinai were based on unlawful race, nationality and religious discrimination. After a jury verdict in favor of the plaintiff, the district court granted Mt. Sinai's motion for judgment notwithstanding the verdict on the basis that the plaintiff had failed to make out a prima facie case against Mt. Sinai since it was not the plaintiff's employer. The Eleventh Circuit, following Sibley, reversed the district court and reinstated the jury's verdict, holding that Title VII extended beyond the immediate employer-employee relationship to include Mt. Sinai.

In King v. Chrysler Corp., supra, the plaintiff was employed by an independent food services contractor which operated the cafeteria at defendant Chrysler's plant. The plaintiff claimed she was sexually harassed by an employee of Chrysler while she worked in the cafeteria and brought suit against Chrysler under Title VII. The district court, also following Sibley, determined that the plaintiff could proceed against Chrysler un-

der Title VII even though Chrysler was not her employer.

In *Pelech v. Klaff–Joss, L.P., supra,* the plaintiff, a female security guard employed by a private security company, applied for a position as an elevator starter in an office building that she patrolled. The defendant, a cleaning company that had been hired by the building owner and given the responsibility to interview and recommend (but not hire) the candidate for elevator starter, refused to interview the plaintiff. The plaintiff charged that the refusal to interview her was based on her gender. The district court denied a motion to dismiss which argued that because the cleaning company was not the plaintiff's employer, it was not subject to Title VII. The district court held that because the defendant controlled plaintiff's employment opportunity, it was within the ambit of Title VII.

In these and the other cited cases, defendants who were not the plaintiffs' employers denied the plaintiffs certain employment opportunities. The defendants all had significant control over the plaintiffs' ability to work or obtain employment. As a result, the plaintiffs were allowed to pursue relief under Title VII against the defendants even though they were not the plaintiffs' employers.

A recently-decided case which examined this issue in detail is *Moland v. Bil–Mar Foods,* 994 F.Supp. 1061 (N.D.Iowa 1998). In *Moland,* the plaintiff was an employee of IBP Corporation ("IBP") which assigned her to work in the scale house at defendant Bil–Mar's turkey processing plant. Moland's duties required her to weigh IBP trucks as they left the processing plant. Bil–Mar and IBP's operations were interrelated only to the extent that Bil–Mar had agreed to permit IBP to use Bil–Mar's scale house to weigh its trucks. *Id.* 994 F.Supp. at 1066. IBP set Moland's work schedule at the scale house, not Bil–Mar, and IBP supervised her work, paid her and provided her benefits. *Id.* 994 F.Supp. at 1067.

During her assignment to the Bil–Mar scale house, the plaintiff was sexually harassed by a Bil–Mar employee. After complaining to Bil–Mar about the harassment, Bil–Mar orally reprimanded the employee but contacted IBP to request that Moland no longer be assigned to work in Bil–Mar's scale house. IBP subsequently told Moland that she would no longer be assigned to work at the scale house due to Bil–Mar's request. *Id.*

Following her removal from the scale house, Moland was told by IBP that she would be reassigned to another position at IBP. No positions were made available, however, and Moland was dropped from IBP's seniority roll and her employment terminated after one year. Moland then brought suit against Bil–Mar seeking relief under Title VII. *Id.*

In its motion for summary judgment, Bil–Mar argued, as WCCC does here, that no employment relationship existed between itself and the plaintiff, and therefore, the plaintiff could not invoke the protections found in Title VII. The court denied Bil–Mar's motion and determined that although the plaintiff was not an employee of Bil–Mar, Moland had asserted a valid Title VII claim because Bil–Mar controlled the plaintiff's access to employment opportunities. *Id.* 994 F.Supp. at 1073.

In this case, WCCC had significant control over Diana's ability to maintain a substantial employment opportunity, even though she was not an employee of WCCC. This type of arrangement is not atypical of the present-day workplace where employees of different employers often work side-by-side and where employment opportunities are controlled by those other than the direct employer. It would undermine the protections of Title VII if an employer could permit discrimination, and not be exposed to Title VII liability from certain employees whose employment opportunities it controlled, simply because those employees were not its own.

As the *Sibley* court pointed out, the broad language of § 2000e–2(a)(1) provides protection to "any individual," not just an employer's employees. *See Sibley,* 488 F.2d. at 1341. Accordingly, because Diana has presented sufficient evidence that WCCC substantially controlled her employment opportunities with Traffic Net, WCCC's motion for

summary judgment as to the first and second counts is denied.

## B. Retaliation Claim

■ In addition to the hostile work environment and quid pro quo claims in the first and second counts of her substitute amended complaint, Diana has asserted in the third count a retaliation claim against WCCC under § 2000e–3 of Title VII. WCCC's motion for summary judgment argues that, in order for WCCC to be liable to Diana under Title VII, it must be her employer. While this argument has been rejected under the *Sibley* line of authorities with respect to Diana's hostile work environment and quid pro quo claims, WCCC's argument warrants additional discussion with respect to Diana's retaliation claim since *Sibley* and most of the cases following its analysis did not involve a retaliation claim under § 2000e–3 of Title VII.

Section 2000e–3 states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter...." 42 U.S.C. § 2000e–3(a). The language in § 2000e–3(a) prohibits discriminatory conduct by an employer against "his employees or applicants for employment." In contrast, § 2000e–2 prohibits discriminatory conduct by an employer against "any individual."

As mentioned in the discussion of Diana's hostile work environment and quid pro quo claims, the *Sibley* court examined § 2000e–2 and reasoned that because Congress had chosen to use the term "any individual" in that section, it did not intend "to confine the meaning of 'any individual' to include only former employees and applicants for employment, in addition to present employees. Those words should, therefore, be given their ordinary meaning so long as that meaning does not conflict with the manifest policy of

the Act." *Sibley*, 488 F.2d. at 1341. This led to the conclusion that "the proscriptions contemplated by [§ 2000e–2] reach beyond the immediate employment relationship." *Id.* The decision, however, did not address § 2000e–3 and whether the use of the term "employee" in that section of the statute meant that Congress intended to limit retaliation claims to a narrower class of plaintiffs than those who could bring sexual harassment claims under § 2000e–2.

Since *Sibley* was decided few courts have discussed what has become known as "Sibley standing" in the context of retaliation claims under § 2000e–3. In *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870 (6th Cir. 1991), however, the Sixth Circuit determined that § 2000e–3 applied to the same broad category of persons as § 2000e–2. *See also Moland, supra; LeMasters v. Christ Hospital*, 777 F.Supp. 1378 (S.D.Ohio 1991); *cf. Pelech*, 815 F.Supp. at 263 (allowing a Title VII retaliation claim to go forward under the *Sibley* analysis without comparing the language of § 2000e–2 and § 2000e–3). The *Christopher* court recognized that *Sibley* did rely to some extent on the "any individual" language of § 2000e–2, but that was not the sole basis of *Sibley*'s holding. The court in *Christopher* pointed out that *Sibley* also relied on the general remedial section of Title VII which provides remedies to "persons aggrieved," a broader class than just employees. *Christopher*, 936 F.2d. at 876 (citing *Sibley*, 488 F.2d. at 1341–42.).[4] *See* 42 U.S.C. § 2000e–5(b). As the Sixth Circuit pointed out in *Christopher*, "the remedial section to which [*Sibley*] refers, § 2000e–5, applies equally to plaintiffs suing under § 2000e–2 or § 2000e–3." *Christopher*, 936 F.2d. at 876. The Sixth Circuit also concluded that *Sibley* and its progeny "were discerning the meaning of 'employee' in the Title VII context by looking to the intent and scope of Title VII as a whole." *Id.* This court agrees that the definition of employee,

4. Congress's use of the language "a person claiming to be aggrieved" in Title VII has been interpreted as evidence of a "congressional intention to define standing [under Title VII] as broadly as is permitted by Article III of the Constitution." *Hackett v. McGuire Bros.*, 445 F.2d 442, 446 (3d Cir.1971); *accord Trafficante*

*v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (quoting *Hackett*); *Leibovitz v. New York City Transit Authority*, 4 F.Supp.2d 144, 148 (E.D.N.Y.1998). "An aggrieved person obviously is any person aggrieved by any of the forbidden practices [described in Title VII]." *Hackett*, 445 F.2d. at 445.

354

as it is used in § 2000e–3, should be viewed in light of the broad remedial purpose of Title VII as a whole. *Cf. Sherman v. Burke Contracting, Inc.*, 891 F.2d at 1532 (extending § 2000e–3 protection to former employees on the basis that a strict and narrow interpretation of the word "employee" to exclude former employees would undercut the obvious remedial purposes of Title VII).

Although the narrower language of § 2000e–3 makes it less clear that Congress intended to permit retaliation claims to be brought by a plaintiff who was not the employee of the defendant,[5] it would be contrary to the expressed legislative intent and common sense to allow claims under § 2000e–2 but not § 2000e–3. Typically, retaliation claims reflect two wrongs: the original discrimination and the subsequent retaliation for reporting or opposing the discrimination. Surely, Congress could not have intended that Diana's sexual harassment claim could be brought against WCCC under Title VII while, at the same time, WCCC would be immune under Title VII from Diana's retaliation claim, which is based on further discriminatory conduct that took place after Diana objected to WCCC's initial discrimination. As the court in *Christopher* explained:

> As the goal of Title VII is to preserve employment opportunity, we can see no reason to conclude that Congress intended Title VII to prohibit discrimination by a non-employer defendant on the basis of race or sex, and to allow the same non-employer defendant to discriminate against a person who engages in protected activity under Title VII [i.e. opposing discriminatory conduct, which action is protected by § 2000e–3.]. In both instances the acts of the non-employer defendant have the effect of denying the plaintiff employment based upon impermissible grounds under the Act. Thus we find that the trial court had jurisdiction to hear Christopher's

§ 2000e–3 claim based upon the principles and reasoning articulated in *Sibley* ... and its progeny.

*Christopher*, 936 F.2d. at 876–77. *Accord, Moland*, 994 F.Supp. at 1076; *LeMasters*, 777 F.Supp. at 1381. Accordingly, Diana may pursue a retaliation claim against WCCC under Title VII, even though WCCC was not her employer. Summary judgment, therefore, is also denied as to the Third Count of the complaint.

## IV. CONCLUSION

For the foregoing reasons, WCCC's motion for summary judgment is DENIED.

---

**5.** In § 2000e–2(a), Congress provided that it was unlawful for an employer to discriminate against "any individual." In § 2000e–2(b), Congress provided that it was unlawful for an employment agency to discriminate against "any individual." In § 2000e–2(c), Congress provided that it was unlawful for a labor organization to discriminate against "any individual." In contrast, § 2000e–

3(a) makes it an unlawful employment practice for an employer to discriminate against "any of *his* employees or applicants for employment," for an employment agency to discriminate against "any individual," and for a labor organization to discriminate against "any member." 42 U.S.C. § 2000e–3(a) (emphasis added).