NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a1021n.06

Nos. 12-5967; 12-6236

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | **FILED** Dec 10, 2013 DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| MAURICE KNOX, | ) ) | |
| Intervening Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| SKANSKA USA BUILDING, INC., | ) ) | THE WESTERN DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) ) ) | |

Before: ROGERS and KETHLEDGE, Circuit Judges; and BORMAN, District Judge.[*]

KETHLEDGE, Circuit Judge. Skanksa USA Building, Inc. was the general contractor for

a construction site in Memphis. A Skanska subcontractor hired Maurice Knox and several other

African-American men to operate a temporary elevator at the site. They were subjected to extensive

harassment based on their race. The Equal Employment Opportunity Commission and Knox

thereafter sued Skanska, alleging racial discrimination and retaliation in violation of Title VII,

42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981. Although Skanska did not employ Knox directly,

---

[*]The Honorable Paul D. Borman, United States District Court Judge for the Eastern District of Michigan, sitting by designation.

the plaintiffs argue that Skanksa acted as his joint employer. The district court disagreed and granted

summary judgment to Skanska.  We reverse.

I.

We take the facts in the light most favorable to the plaintiffs.  *See Scott v. Harris*, 550 U.S.

372, 378 (2007).  Skanska is a general contractor.  From 2007 to 2010, Skanska managed the

construction of a new hospital facility in Memphis, Tennessee for Methodist Le Bonheur Healthcare.

Skanska coordinated the work of its subcontractors.  One of those subcontractors was C-1, Inc., a

small contractor owned by Gerald Neely.

A.

Skanska contracted with C-1 to provide operators for the construction site's two buck hoists.

Buck hoists are temporary elevators that run up and down the outside of buildings under

construction.  C-1 hired Maurice Knox, Samuel Burt, and Robert Vassar, among others, as buck-

hoist operators for the Le Bonheur project.  All three men are African-American.  Skanska paid C-1

$18 per hour per operator; in turn, at Skanska's suggestion, C-1 paid the operators $9 per hour.

Under the terms of C-1's subcontract with Skanska,  Neely would supervise  the buck-hoist

operators, but Skanska could remove an operator from the site if the employee was "incompetent,

disorderly, or otherwise unsatisfactory."

In reality, however, C-1 had minimal oversight over the operators.   Their daily

responsibilities and assignments were "directed by Skanska."  Skanska set their hours, collected

their time sheets, taught them how to use the buck hoist, and required them to attend safety training.

Moreover, contrary to the terms of its contract with Skanska, C-1 did not employ anyone to

supervise the operators on-site. Instead, Skanska employees supervised them. Skanska eventually assigned another subcontractor's employee, Bernie Smith, to supervise the operators. At the suggestion of a Skanska employee, Smith kept detailed notes regarding the operators' job performance.

Neely came to the site only a few times. Skanska did not tell Neely "anything that [went] on with the buck hoist[,]" and one of the operators had to call Neely on his cell phone whenever a buck hoist broke. Skanska also carried workers' compensation and liability insurance for C-1's employees.

When Skanska removed an operator from the job site, C-1 generally fired the worker without requiring Skanska to provide an explanation for the removal. Several months into the contract, Skanska asked C-1 to replace Samuel Burt and another employee because of "personality issues." Neely replaced these workers without being "clear . . . what the exact issues and/or problems were." Removal from the site typically ended an operator's employment with C-1, because C-1's contracts with its laborers were job-specific.

B.

Knox began working at the Le Bonheur site in August 2009. Shortly thereafter, other workers at the site called Knox a "monkey" and a "n-----." Knox also saw racist graffiti in the portable toilets, including the word "n-----," the phrase "n-----s have to leave," and "a depiction on the toilet walls of a white person holding a shotgun and shooting a black person." Burt also heard workers refer to the operators as "n-----s" and "black motherf-----s." Although Burt called Neely each day to report these incidents, Neely merely told him to tell Skanska about them. Knox and Burt

also complained repeatedly about the name-calling and graffiti to two of Skanska's managers, Norberto Jiminez and Robert Jones. Neither manager took action.

Other workers likewise subjected Robert Vassar to racial comments "every single day" after he began work at the Skanska site. When the workers thought that Vassar took too long to pick them up in the buck hoist, they would call him racial slurs over the walkie-talkie. Skanska's manager, Jimenez, could hear the slurs over the walkie-talkie, but apparently did nothing about them. One day in August 2009, Vassar came to work using crutches for a broken leg. A Skanska supervisor told him to "get the hell off my jobsite" and that "[y]ou n-----s always think you[] are heroes." Vassar called Neely, who told Vassar that "there was nothing he could do" about it.

On August 19, 2009, while Knox was operating the buck hoist, someone threw liquid from a porta-potty onto his arms and into his eyes, which immediately began to swell. Knox told Neely and Jiminez about the incident and said that he needed to go home to clean himself. Knox returned to work on August 21, 2009. Later that day, he had an altercation with another contractor's employee. Someone reported the incident to Jiminez, who went to investigate. When Jiminez arrived on the scene, the other subcontractor's employee admitted to using racial slurs towards Knox. Jiminez sent Knox home to "calm down."

After the August 21 incident, Skanska executive Mike Rayburn replaced all of the C-1 operators with Skanska employees. Neely approached Le Bonheur Healthcare's Vice President of Facilities Management, David Rosenbaum, to appeal this decision. Rosenbaum ordered Skanska to "reinstate[]" C-1 as a subcontractor and gave C-1 permission to bring back whomever it wanted. Neely brought back Knox and Burt.

Knox and Burt returned to the site on August 27. Shortly thereafter, Rayburn met with Knox, Burt, and a Skanska-designated supervisor. Rayburn was unhappy "because [Knox and Burt] were representing Skanska, [and] they did not exhibit what I wanted them to exhibit." Rayburn told Knox, Burt, and the supervisor that, when "people come on the job, . . . [and see] tension between individual employees that work for us . . . or work, you know, under our direction . . . I think you've got to change that." Rayburn did not tell Neely about the meeting. On September 1, Skanska also distributed a document—entitled "Buck-hoist Operator Responsibilities"—which outlined the operators' work hours, breaks, and duties. Two days later, Skanska removed Knox from the site for using his cell phone while on the job. Burt remained at the site, but continued to hear racial slurs every day. He left the site when Skanska discontinued using the buck hoist.

C.

The Equal Employment Opportunity Commission thereafter sued Skanska for subjecting Knox and the other buck-hoist operators to a hostile work environment because of their race, in violation of Title VII, 42 U.S.C. § 2000e-2(a). The EEOC also alleged that Skanska had retaliated against Knox and the other workers for complaining about the harassment. Knox filed a motion to intervene, which the district court granted. The EEOC and Knox moved for partial summary judgment on the ground that Skanska was the operators' joint employer and thus liable under Title VII. Skanska cross-moved for summary judgment. The court denied the plaintiffs' motions and granted Skanska's motion. This appeal followed.

II.

We review the district court's decision to grant summary judgment de novo. *See Fuhr v.*

*Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013).

A.

Title VII prohibits employers from discriminating against "any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits

employers from retaliating against their employees or applicants for employment "because [they]

ha[ve] opposed any practice made an unlawful by [Title VII], or because [they] made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

[Title VII]." *Id.* § 2000e-3(a).

Skanska did not employ the buck-hoist operators directly. The parties both assume that a

defendant can be liable under Title VII pursuant to a joint-employer theory. We have made the same

assumption in dicta. *See Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491

(6th Cir. 2011). And three other circuits have actually applied the test to determine whether an

entity is liable under Title VII. *See, e.g.*, *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1277 (9th

Cir. 2003); *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997); *Virgo v. Riviera Beach Associates,*

*Ltd.*, 30 F.3d 1350, 1359 (11th Cir. 1994). Thus, although the parties have not briefed the doctrine's

applicability, we apply the doctrine here.

Entities are joint employers if they "share or co-determine those matters governing

essential terms and conditions of employment." *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir.

1985). To determine whether an entity is the plaintiff's joint employer, we look to an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance. *Id.* Here, Skanska supervised and controlled the operators' day-to-day activities without any oversight from Neely. As a general matter, Skanska routinely exercised its ability to direct and supervise the operators' performance. Skanska set the operators' hours and daily assignments. Skanska assigned the operators' supervisors. When the operators complained about the conditions on site, Skanska handled their complaints. When the operators had disagreements with their supervisors, Skanska arranged a meeting to discuss the situation. Moreover, Skanska did not consult with Neely about the operators' complaints or their conflicts with Skanska's supervisors. And when the operators called Neely to ask him to improve conditions at the site, Neely did nothing.

Particular incidents likewise demonstrate Skanska's control over the operators. As discussed above, Skanska executive Mike Rayburn called a meeting with Knox, Burt, and a Skanska-designated supervisor because "[the buck-hoist operators] were representing Skanska" and the operators "work, you know, under our direction." No one told Neely about this meeting. Skanska also had Knox and Burt sign a document—typed on Skanska letterhead—entitled "Buck-hoist Operator Responsibilities." And Skanska repeatedly removed C-1's operators from the job site without any challenge from Neely.

The reality is that C-1 was a nonentity on the construction site. That the terms of C-1's contract with Skanska envisioned a more active role for C-1 is besides the point. Viewed in the light

most favorable to the plaintiffs, the record here is enough to support a determination Skanska jointly employed the operators.

The district court's judgment is reversed, and the case remanded for further proceedings consistent with this opinion.