NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0300n.06

No. 19-5499

UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT

THOMILA GALE NETHERY,                )
                                     )
        Plaintiff-Appellant,         )
                                     )
v.                                   )
                                     )        ON APPEAL FROM THE
QUALITY CARE INVESTORS, L.P., dba Quality )   UNITED STATES DISTRICT
Center for Rehabilitation and Healing, fka Quality )   COURT FOR THE EASTERN
Care Nursing Home,                   )        DISTRICT OF TENNESSEE
                                     )
        Defendant-Appellee.          )

**FILED**
May 28, 2020
DEBORAH S. HUNT, Clerk

BEFORE: BATCHELDER, WHITE, and THAPAR, Circuit Judges.

PER CURIAM. Plaintiff-Appellant Thomila Nethery worked as a physical-therapist assistant at a nursing home operated by Defendant-Appellee Quality Care Investors, L.P. (Quality Care) in Lebanon, Tennessee, known as the Quality Care Health Center (the Lebanon Facility). Nethery was hired by Reliant Management Group, LLC (Reliant), which contracted with the owners of facilities throughout the country, including Quality Care, to provide various services to their patients.

Nethery reported that she was sexually harassed by her on-site supervisor, Patrick Grubbs, a Reliant employee. Reliant investigated these complaints and ultimately fired Grubbs. Shortly thereafter, Samantha Mullins, Quality Care's administrator for the Lebanon Facility, complained to Reliant that Nethery was not a good fit at its workplace. Following the course of performance between Reliant and Quality Care, Reliant removed Nethery from the Lebanon Facility.

Nethery brought this action against Quality Care for unlawful retaliation under Title VII of the Civil Rights Act of 1964. Nethery alleges that Mullins, upset over the termination of Grubbs, demanded that Reliant remove Nethery. The parties dispute the specifics of these events and the nature of Nethery's relationship with Quality Care.

The district court granted summary judgment for Quality Care, concluding that Nethery could not bring a Title VII claim against Quality Care because (1) Quality Care was not Nethery's "joint employer for purposes of Title VII," R. 99, PID 2292, and (2) Quality Care "did not have control over [Nethery's] access to employment opportunities with Reliant or any other third party," *id.* at 2294. Nethery appeals.

Because Nethery did not provide sufficient evidence to establish that Quality Care acted as her joint employer or significantly interfered with her access to employment opportunities, we AFFIRM.

## I.

In 2010, Quality Care contracted with Reliant to provide services to its residents at the Lebanon Facility, including physical therapy. The agreement between Quality Care and Reliant states that it is "a contract between independent parties and shall not be construed to create any relationship other than that of independent contractors." R. 46-5, PID 617. The contract also states that Quality Care would "retain administrative and professional responsibility for control over and supervision of the provision of Services rendered to patients in all respects, as required by state and federal laws" and that Quality Care would provide Reliant with access to Quality Care's "notices, policies, and procedures, including updates thereto provided from time to time by [Quality Care], and [Reliant] shall comply with all such notices, policies, and procedures." *Id.* at 608, 614.

In 2011, Reliant interviewed and hired Plaintiff Thomila Nethery to be a licensed physical-therapist assistant at the Lebanon Facility.

**A.**

The parties dispute the degree of control Quality Care had over Reliant personnel. The parties do not dispute, however, that while Nethery worked at the Lebanon Facility, Reliant set her rate of pay, paid her wages, and provided her with fringe benefits. Nethery's paychecks identified Reliant as the entity paying her. Nethery received sick leave and paid time off from Reliant. Nethery's W-2 forms identified Reliant as her employer. Nethery participated in Reliant's group-health-insurance and 401(k) plans. Quality Care did not provide Nethery with any wages or fringe benefits or issue her any paychecks or W-2 forms.

Nethery reported to and was supervised by Grubbs, Reliant's onsite director of rehabilitation. Grubbs set Nethery's work schedule and Nethery was required to contact Grubbs if she needed to make changes to her schedule or call in sick. Grubbs testified that he set the patients' therapy schedules, and that Reliant therapists had to clock in and out on Reliant's computers. Grubbs reported to and was supervised by one of Reliant's regional directors.

Grubbs testified that he conducted annual evaluations of the Reliant therapists that did not include input from Quality Care and that he was never asked by Quality Care to discipline an employee. Similarly, Nethery testified that no one from Quality Care made sure she met her goals and that Reliant would talk to her about any performance concerns. Peggy Gourgues, Reliant's Chief Operating Officer, testified that Reliant had "the sole authority to . . . train [Reliant therapists]; set their work schedule; supervise them; . . . conduct their performance reviews; discipline them; [and] terminate their employment." R. 53-1, PID 900–01.

Grubbs testified that he and the Reliant therapists attended Quality Care safety meetings that covered topics such as fire response and evacuation preparedness, and Reliant therapists used a "fall packet" if a patient was dropped or fell, which was provided by Quality Care and completed jointly by Reliant therapists and Quality Care nurses, R. 57-1, PID 1335–36. Grubbs recalled that at one morning meeting, Quality Care's director of nursing, Tamera Gulley, instructed Grubbs that when patients hit their call buttons, Reliant therapists should answer the call lights. Nethery testified that a Quality Care nurse assistant made a written complaint against her for failing to respond to a call light. Mullins testified this was not a "requirement per se" but was a matter of customer service and patient care. R. 46-2, PID 535.

Mullins testified there were quarterly meetings organized by Quality Care that were attended by Reliant personnel. Mullins denied that Quality Care told Reliant staff that they were required to attend these meetings but explained that Reliant and Quality Care did have to go over shared expectations and goals. Roderick Wolfe, Mullins's predecessor as administrator of the Lebanon Facility, testified that these meetings were not mandatory for Reliant employees.

**B.**

In March of 2016, Nethery fell and suffered a knee injury at work. Grubbs testified that Nethery came to him to notify him of the fall. After Grubbs failed to reach his supervisor, he called Reliant's corporate office. Grubbs was instructed by a Reliant employee (he could not recall the individual's name) to get a drug-test kit and an accompanying form from Quality Care. Grubbs obtained the drug-test kit from Quality Care and administered it to Nethery. Quality Care's response to the Equal Employment Opportunity Commission regarding Nethery's charge of discrimination stated that "Quality Care required [Nethery] to take a drug test because she was involved in a workplace accident." R. 50-1, PID 705. Mullins, however, testified that Quality

Care did not have a drug-screen policy for contract employees. Grubbs stated that he was later informed by his manager that the drug test was unnecessary.

Nethery testified that, "a couple of years" prior to this incident, Quality Care's nurse educator advised her that drug tests were part of Quality Care's protocol when responding to injuries on the job, R. 54-1, PID 984-85, and that after she tripped and hurt her knee, Grubbs "called administration at Quality to ask what to do." R. 54-1, PID 974. According to Nethery, Quality Care's nurse educator instructed Grubbs to have Nethery complete a complaint form and a urine test. As Nethery was heading to the bathroom, Grubbs told her, "I'm going to sniff it. I'm going to play it in [sic]. I'm going to splash it in my face. I love golden showers." *Id.* at 974–75.

**C.**

Nethery testified that on one occasion, Grubbs "bent down and . . . acted like he was going to kiss [her] on the butt." R. 54-1, PID 968. On another occasion Grubbs made sexually suggestive comments to her and used a licorice stick to mimic oral sex. Nethery further testified that Grubbs made sexual comments to Nethery and other therapists daily, and that on several occasions, Grubbs called Nethery and other therapists "witch" or "b----," *id.* at 971–72.

Ann Vondran, another Reliant therapist, recalled a meeting in which Mullins explained that if any of the staff had concerns, they should see Mullins about them. Following these instructions, Vondran did go to Mullins to make her aware that Grubbs was making inappropriate comments.

In April 2016, several Reliant employees, including Nethery, complained to Reliant that Grubbs had engaged in inappropriate behavior. Reliant directed the Reliant physical therapists not to discuss the sexual harassment allegations against Grubbs with Quality Care. As a result of the complaints, Reliant removed Grubbs from the Lebanon Facility while members of Reliant's human resources department investigated the complaints. Reliant then fired Grubbs later that month.

Nethery testified that the day after Reliant removed Grubbs, Mullins approached her to investigate the situation. According to Nethery, Mullins stated, "I'm letting you know that anyone that I think isn't a good fit for Quality, I can remove. And I want to know what happened." R. 54-1, PID 1033–34. Reliant therapist Marilyn Franklin testified that Mullins also approached her and told her that she had to answer all of Mullins's questions because Mullins "could hire or fire anybody she wanted." R. 55-1, PID 1158.

Mullins testified that upon learning of Reliant's investigation of Grubbs, she began her own investigation. As part of this investigation, she spoke to Reliant therapists but did not recall many specifics of these conversations. Mullins denied saying that she had the right to remove anyone from the facility, and denied telling staff that they had to answer her questions.

**D.**

During Reliant's investigation of Grubbs and after Grubbs was removed from the Lebanon Facility, Gourgues, Reliant's Chief Operating Officer, was in direct contact with Mullins. According to Gourgues, Mullins was upset that Reliant had removed Grubbs from the Lebanon Facility because Mullins felt he "was a very good director of rehab" and that "he was a very good fit for her building." R. 53-1, PID 866. Gourgues testified that Mullins compared Grubbs to Todd Chrisley from the television program *Chrisley Knows Best* because he was "a very charismatic character that makes little comments that she described as some might perceive as rude or crude." *Id.* at 868.

Gourgues stated that during this same conversation or shortly thereafter, Mullins "stated that [Nethery] was not a team player . . . as she suspected she had filed a reckless grievance." *Id.* at 904. Gourgues testified that Mullins believed that Nethery and fellow therapists were "conspiring against Mr. Grubbs," *id.* at 867, and the allegations against Grubbs were false.

According to Gourgues, Mullins requested that Nethery "not practice in" the Lebanon Facility because Nethery was not a "team player" and "not a good fit." *Id.* at 871.

Mullins gave a different account of these conversations. When asked if she requested that Reliant remove Nethery from the Lebanon Facility, Mullins responded, "I said that I'm not for sure that she's a good fit. I'm not for sure she's what our patients need for healing and getting well, encouragement." R. 51-1, PID 785. When asked if she made any effort with Reliant to help Grubbs keep his job, Mullins responded:

> I'm sure I emphasized how much progress that we had made in, you know, continuity and, you know, the improvements that we had made in the therapy department and the—well, within the entire building, the continuity and the ability to work together.

*Id.* at 809.

The record indicates that Quality Care had a practice of advising Reliant if a Reliant staff person was not a good fit for the Lebanon Facility. It is undisputed that Mullins advised Reliant that Nethery was not a team player and not a good fit for the nursing home.[1] Gourgues summarized Reliant's response upon receiving these kinds of complaints about Reliant staff:

> There have been numerous occasions over the years in which a client, including but not limited to Quality Care, has informed me that a particular therapist or other Reliant Rehabilitation employee is not a good fit with the client; and we have removed the employee in question from the facility -- from the client's facility as a courtesy to them.

R. 53-1, PID 905.

On April 28th, 2016, Nethery had a conference call with members of Reliant's national staff, including Gourgues and Jerrod Landress, Reliant's regional manager. According to Nethery,

---

[1] In Quality Care's Response to Plaintiff's Statement of Additional Material Facts Pursuant to L.R. 56.01(c), Quality Care did not dispute that Mullins stated she wanted Nethery "removed" from the Lebanon Facility. R. 96, PID 2273. In Quality Care's brief to this court, however, it asserts that "Ms. Gougues [sic] *interpreted* Ms. Mullins' comments to mean that Reliant should remove Nethery . . . from the Lebanon Facility." Appellee's Br. at 13 (emphasis added).

Landress told her that she would need to be removed from the Lebanon Facility for Reliant to keep its contract with Quality Care. When Nethery asked if she could relocate to a nearby facility, she was told that she could not because they were Quality Care's sister companies, and that the only options for relocation were out of state. Nethery declined the transfer and Reliant terminated her employment. Nethery later received a severance package and a letter of recommendation from Reliant that gave her "the highest recommendation of performing [her] duties." R. 54-1, PID 1047.

## II.

This court reviews a grant of summary judgment de novo. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could decide for the nonmovant. *Hostettler*, 895 F.3d at 852. We view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 302 (6th Cir. 2018). The key inquiry for this court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016).

## III.

To establish her claim under Title VII, Nethery must show that Quality Care was her "employer" within the meaning of the statute. *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997). Nethery argues that she satisfied this requirement under two

theories: (1) Quality Care qualified as Nethery's joint employer, and (2) Quality Care controlled access to Nethery's employment opportunities. We address each argument in turn.

**A.**

Under the "joint-employer" theory, "an entity that is not the plaintiff's formal employer may be treated under these doctrines as if it were the employer for purposes of employment laws such as Title VII." *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011). Entities are joint employers if they "share or co-determine those matters governing essential terms and conditions of employment." *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013) (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985)); *see also Sanford*, 449 F. App'x at 492. In determining whether an entity is the plaintiff's joint employer, the major factors include the "entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *Skanska*, 550 F.3d at 256.

The parties agree that Reliant alone set Nethery's rate of pay, paid her wages, provided her with fringe benefits, and provided her with sick leave and paid time off. The parties also agree that Nethery's W-2 forms identified Reliant as her employer and that Nethery was part of Reliant's group-health-insurance and 401(k) plans. And Nethery presented no evidence that Quality Care had input into her compensation or benefits with Reliant.

Nethery argues that Reliant had a practice of "removing employees at [Quality Care's] insistence." Appellant's Br. at 20. When it received a complaint from Quality Care about a Reliant employee, Reliant's practice was to remove the employee from the Lebanon Facility and then offer a transfer to another facility or, should the employee decline a transfer, a severance package.

The only evidence that Quality Care had the ability to directly fire Reliant employees is the testimony of Nethery, and Franklin, that Mullins told them she could remove anyone she wanted.

Nethery argues that her employment arrangement is analogous to that in *Skanska*. 550 F. App'x 253. The similarities, however, are minimal. In *Skanska*, a machine operator, Maurice Knox, was directly employed by a subcontractor, C-1, while working at a construction site managed by Skanska. *Id.* at 254. After Knox experienced harassment at work, the Equal Employment Opportunity Commission and Knox sued Skanska for racial discrimination and retaliation in violation of Title VII. *Id.* at 253. The district court granted summary judgment to Skanska, rejecting the argument that Skanska and C-1 acted as his joint employers. *Id.* The Sixth Circuit reversed, finding the record sufficient to support a determination that Skanska jointly employed Knox. *Id.* at 256. Unlike Quality Care in the present case, "Skanska routinely exercised its ability to direct and supervise the operators' performance[,]" including by "set[ting] the operators' hours and daily assignments" and "assign[ing] the operators' supervisors." *Id.* This court concluded "that C–1 was a nonentity on the construction site." *Id.* Here, Reliant provided computers for Nethery to clock in and out, and provided an on-site supervisor who set Nethery's schedule, approved her time-off requests, supervised her performance, and conducted her annual evaluations. When Mullins attempted to investigate the firing of Grubbs, Reliant instructed its employees not to discuss the issue with Quality Care. Even viewing the facts in favor of Nethery, this record establishes that Reliant retained near complete control over Nethery's employment and was not a nonentity at the Lebanon Facility.

Based on the foregoing, we conclude that Nethery has not provided sufficient evidence that Quality Care was her joint employer to overcome summary judgment. *See Skanska*, 550 F. App'x at 256; *Sanford*, 449 F. App'x at 492.

**B.**

In addition to her joint-employer theory, Nethery argues that Quality Care is liable under *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870 (6th Cir. 1991), because it interfered with her employment opportunities. Appellant's Br. at 13. That argument falls short for a few reasons.

In *Christopher*, this court held that a non-employer may be held liable under Title VII if it significantly affects an individual's access to employment opportunities with third parties. That case involved a plaintiff who worked in a hospital as a nurse. *Christopher*, 936 F.3d at 871–72. She had been hired by a third party (a group of physicians) to help them as they performed surgeries. *Id.* at 872–73. After a while, the hospital denied her practicing privileges so she couldn't work as a nurse in that facility. *Id.* at 873. But that completely prevented her from working for the physicians. In those circumstances, the court reasoned, denying Christopher's hospital privileges effectively denied her employment. *Id.* at 875. Because the hospital significantly affected her ability to perform her job, the court allowed a Title VII claim to proceed.

This case is materially different. Unlike in *Christopher*, as the district court explained, Quality Care does not stand as an intermediary between the plaintiff and a third party. Quality Care is one of Reliant's clients—they are a consumer of the services that Reliant offers. Although Quality Care may have affected Nethery' ability to work at *Quality Care's* Lebanon facility, it did not prevent her from working for *Reliant* at other facilities. After all, Reliant did offer Nethery employment at an out-of-state facility. What's more, Reliant at all times held the sole power to remove Nethery from Quality Care's Lebanon facility.[2] So that makes this case unlike

---

[2] The dissent claims that "Quality Care's actions prevented [Nethery] from working at the only facility where we know she was hired and contracted to work." Dissent at 5. Not so. It was *Reliant* who removed Nethery from the Lebanon facility. Quality Care had no authority do so. And any influence that Quality Care did have over Reliant's employees was because Reliant took Quality Care's wishes into account when exercising *its own* power.

*Christopher*, where the defendant's conduct made it impossible for the plaintiff to work for her employer.

That distinction makes a difference. In *Satterfield v. Tennessee*, the court rejected an interfering-with-employment-opportunities claim where (like here) the employer "at all times retained control over [the plaintiff's] *access* to his employment." 295 F.3d 611, 618 (6th Cir. 2002). As in *Satterfield*, the employer here held the sole power to remove Nethery from her place of employment. It also held the sole power to offer Nethery employment opportunities at other facilities. Nethery's claim thus fails for the same reason that Satterfield's did. *See Shah v. Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) (finding *Christopher* inapposite when the evidence didn't show that the defendant's obstructive conduct "directly impair[ed] [the plaintiff's] employment with third parties").

*Satterfield*'s focus on the employer's control over the employee makes good sense. Nethery argues that Quality Care interfered with her employment at Reliant because Reliant refused to send her to any of the other local facilities that Reliant contracted with. Reliant refused to staff her at those facilities because they were affiliated with Quality Care—and Mullins did not want Nethery at the Lebanon facility. But that cannot be enough to create a fact issue as to liability.

\*\*\*

Because Nethery has not shown a genuine dispute of material fact that Quality Care was her joint employer or interfered with her access to employment opportunities with Reliant, we AFFIRM.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part**. I concur in the majority's discussion and disposition of Nethery's claim that Quality Care acted as her joint employer. I dissent, however, from the affirmance as to Nethery's claim under *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870 (6th Cir. 1991). Because Nethery has made a sufficient showing that Quality Care significantly affected or interfered with her access to employment opportunities with Reliant, I would reverse as to the *Christopher* claim and remand for further proceedings.

In *Sibley Memorial Hosp. v. Wilson,* 488 F.2d 1338 (D.C. Cir. 1973), the defendant hospital ran a nursing office to coordinate placement of private nurses for patients upon their request. The plaintiff, a male private nurse, claimed that the hospital had refused to refer him to female patients. *Id* at 1339–40. The court acknowledged that the parties "did not contemplate any immediate or future relationship of direct employment in the sense of the usual indicia of such employment," but held that the hospital could be liable under Title VII because it had "not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties." *Id.* at 1342. The court reasoned that "[t]o permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer . . . would be to condone continued use of the very criteria for employment that Congress has prohibited." *Id.* at 1341.

The D.C. Circuit extended *Sibley* in *Shehadeh v. Chesapeake & Potomac Tel. Co. of Maryland*, 595 F.2d 711 (D.C. Cir. 1978). Shehadeh was fired from C&P during her pregnancy. *Id.* at 715. She then applied unsuccessfully for jobs with other companies. *Id.* Shehadeh alleged that C&P, motivated by discriminatory animus, sent negative references to her prospective employers. *Id.* at 719. Shehadeh argued that "[u]ntrue and damaging accounts of her employment

qualifications were purposefully circulated in consequence of her gender or her husband's ancestry." *Id.* at 719–20. The court reasoned that this type of interference with employment opportunities is potentially more pernicious than the facts considered in *Sibley*:

> The considerations articulated in Sibley Hospital apply with equal force to discriminatorily-motivated propagation of adverse references. A former employer is solidly in position to impede a prior employee's reentry into the job market. When that influence is exerted to limit employment opportunities on grounds of "race, color, religion, sex, or national origin," an evil at which Section 703(a)(1) is unequivocally aimed materializes. To be sure, Sibley Hospital's control of its premises and its status as an intermediary enabled it to bar the complaining nurse from access to requesting patients. That distinction, however, would scarcely comfort a discharged employee unable to secure work because of discriminatory references by the former employer.

*Id.* at 722. The court concluded that "[p]roof of [Shehadeh's] claim plainly would establish a severe constriction of job-market access through distinctions outlawed by Title VII." *Id.* at 723.

Similarly, in the present case, Nethery has presented evidence that Quality Care, in retaliation against Nethery for reporting sexual harassment, demanded that Nethery be removed from the Lebanon Facility, interfering with Nethery's employment with Reliant and constricting her job-market access.

Other circuits have followed this approach. In *Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019 (9th Cir. 1983), Gomez, on behalf of the professional corporation AES, submitted a contract proposal to manage a hospital emergency room. Gomez alleged that the contract proposal to the hospital was rejected because of his Mexican ancestry. *Id.* at 1020. The district court concluded that Gomez lacked standing because "under the proposed contract AES would have been an independent contractor and plaintiff would have been an employee of AES and not of the hospital." *Id.* The Ninth Circuit reversed, noting that Gomez's continued employment with AES did not prevent a Title VII claim:

> Plaintiff alleges defendants' discrimination against him based on his national origin denied him the opportunity to be employed by AES as director of defendants' emergency room. The fact that plaintiff continues as an employee of AES does not mean the employment relationship between AES and plaintiff has not been interfered with. The conditions of plaintiff's employment are different than they would have been had he not been discriminated against.

*Id.* at 1021.

The Sixth Circuit has adopted this line of cases. In *Christopher*, this court, relying on the D.C. Circuit's decision in *Sibley* as well as the Ninth Circuit's decision in *Gomez*, held that a non-employer may be liable under Title VII if it significantly affects an individual's access to employment opportunities. 936 F.2d at 875. Christopher, a scrub nurse employed privately by doctors, brought a Title VII retaliation claim against Stouder, a hospital that denied her nursing privileges. *Id.* at 873. This court found that although Christopher was neither an employee nor an independent contractor of the defendant hospital, there was ample evidence that the hospital "was an organization which was capable of and in fact did affect Christopher's ability to engage in her employment as a scrub nurse." *Id.* at 876. By discriminating against Christopher and denying her privileges to work at its facility, the hospital prevented her from performing the job for which she was hired and interfered with her employment relationship. *Id.* This court therefore concluded that Christopher stated a claim under Title VII. *Id.* at 877.

Similarly, Quality Care's request, direct or implied, that Nethery be removed from the Lebanon Facility prevented Nethery from performing the job for which she was hired. Quality Care used its relationship with Reliant to interfere with Nethery's employment.

This court distinguished *Christopher* in *Satterfield v. Tennessee*, 295 F.3d 611 (6th Cir. 2002), on which the majority relies. In *Satterfield*, the Tennessee Public Service Commission discharged Satterfield from his employment after Bluhm, a physician in private practice at Occupatient, determined from a physical examination that Satterfield was not qualified for the

position. *Id.* at 613. Satterfield sued Bluhm and Occupatient, alleging violations of his rights under the ADA and the Rehabilitation Act, among other claims. *Id.* at 614. The district court "granted summary judgment to the defendants on Satterfield's federal ADA and Rehabilitation Act claims on the ground that Bluhm and Occupatient were not 'covered entities' for the purposes of the ADA or the Rehabilitation Act." *Id.* at 615. This court noted that Satterfield's claim was "arguably most compelling" under the *Christopher* "significantly affects access" theory. *Id.* at 618. In distinguishing *Christopher*, this court wrote that "[e]ven though the Department had a policy of relying on the results of physical examinations performed by Bluhm or other doctors at Occupatient, the Department itself actually controlled Satterfield's access to his employment at all times." *Id.* This court affirmed summary judgment, concluding that the proper defendant for Satterfield's claim was the state agency that followed Bluhm's advice. *Id.* at 619.

The relationship between Nethery and Quality Care was far more substantial than the relationship between Satterfield and Occupatient. While Nethery worked at Quality Care's facility, caring for Quality Care's patients alongside Quality Care employees, Satterfield underwent a single examination by Occupatient to determine his physical qualifications for his job. Further, there is no indication in *Satterfield* that Occupatient had any stake in whether the state agency followed its recommendation. Here, in contrast, Quality Care made the complaint about Nethery in the context of an ongoing business relationship with Reliant. And Quality Care did not simply make a recommendation. Nethery testified that a Reliant regional manager said that she had to be removed from the Lebanon Facility for Reliant to keep its contract with Quality Care. The majority asserts that "Reliant at all times held the sole power to remove Nethery from Quality Care's Lebanon facility" and that "Quality Care had no authority do so." Maj. Op. at 11. This is accurate in the sense that Reliant was Nethery's legal employer. However, the testimony

and course of performance between the companies support a different conclusion. Drawing all reasonable inferences in Nethery's favor, Reliant ceded ultimate assigning authority to Quality Care, allowing the latter to direct the removal of Reliant personnel from Quality Care facilities. Viewing the evidence in the light most favorable to Nethery, Reliant was compelled to remove Nethery from the Lebanon Facility solely in response to Mullins's complaint. Thus, the majority's analogy to *Satterfield* is inapt.

This court again distinguished *Christopher* in *Shah v. Deaconess Hosp.*, 355 F.3d 496 (6th Cir. 2004). Shah was a general surgeon with surgical privileges at Deaconess Hospital. *Id.* at 497. Deaconess revoked part of Shah's surgical privileges after one of his patients died. *Id.* Shah claimed that Deaconess discriminated against him based on his age and national origin. *Id.* Among other considerations, the court noted that Shah performed about forty-five percent of his surgeries outside of Deaconess, treated his own patients, and contracted freely with other hospitals. *Id.* at 500. Distinguishing *Christopher*, this court found nothing in the record to suggest that Shah's partial loss of surgical privileges at Deaconess directly impaired his employment with third parties. *Id.*

Unlike *Shah*, the evidence here does suggest that Quality Care's actions directly impaired Nethery's employment with Reliant. Where Shah performed forty-five percent of his surgeries outside Deaconess, treated his own patients, and freely contracted with other hospitals, there is no evidence here that Nethery worked outside the Lebanon Facility or had any patients other than those provided by Quality Care.

Quality Care argues that Nethery's employment was terminated not because she reported Grubbs but because she turned down Reliant's transfer offer. Quality Care Br. at 15. Similarly, the majority asserts that even if Quality Care "affected Nethery's ability to work at *Quality Care's*

Lebanon facility, it did not prevent her from working for *Reliant* at other facilities" and "[a]fter all, Reliant did offer Nethery employment at an out-of-state facility." Maj. Op. at 11. There are several problems with this analysis. First, the record contains no evidence that Nethery was hired or contracted by Reliant to work anywhere other than the Lebanon Facility. Viewing the facts and drawing all reasonable inferences in favor of Nethery, Quality Care's actions prevented her from working at the only facility where we know she was hired and contracted to work. Second, the record reveals little about Reliant's out-of-state offer, which may have involved a completely new contract, possibly with a different entity, and the *termination* of her old employment. Finally, we do not know whether the offer would have involved a demotion, reduced hours, reduced pay, or other forms of adverse action. Even if these conditions remained the same, this would "not mean the employment relationship between [Reliant] and [Nethery] ha[d] not been interfered with." *Gomez*, 698 F.2d at 1021. As in *Gomez*, the conditions of Nethery's employment would still be "different than they would have been had [she] not been discriminated against." *Id.* And, as Nethery points out, this court has held that a jury could reasonably find that a transfer increasing commute time to the extent the employee must relocate is an adverse employment action. *Keeton v. Flying J, Inc.*, 429 F.3d 259, 265 (6th Cir. 2005). Nethery made a sufficient showing that a transfer would have involved an unworkable relocation. Thus, even under the majority's analysis, Quality Care was responsible for an adverse employment action against Nethery.

Viewing the facts and drawing all reasonable inferences in favor of Nethery, if Mullins had never complained to Reliant regarding Nethery's "fit," Nethery would have continued to work at the Lebanon Facility. Nethery had worked there for over four years prior to her termination. The only other complaint in the record regarding her performance was that she stared blankly at Mullins when asked a question about equipment. Grubbs testified that Nethery was a good therapist and

Nethery received a letter of recommendation from Reliant giving her "the highest recommendation of performing [her] duties." R. 54-1, PID 1047.

In sum, the record supports an inference that Quality Care had the ability to remove Reliant employees from the Lebanon Facility and compel them to make a choice between a transfer to a new facility or separation from Reliant. The record also supports an inference that Mullins had Nethery removed from the Lebanon Facility because she was upset over Nethery's allegations against Grubbs. Thus, Quality Care "was an organization which was capable of and in fact did affect [Nethery's] ability to engage in her employment." *Christopher*, 936 F.2d at 876. Quality Care's acts had "the effect of denying [Nethery] employment based upon impermissible grounds under" Title VII. *Id.* at 876–77. I would therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.